# Gheen, Morgan & Co. *versus* Johnson.

1. M. & Co., who were bankers and brokers, gave to J. a letter to their correspondent, G., a broker in Philadelphia, stating, " this will introduce to you J. Any orders he may give you, please execute on our account and advise us." G. took his orders from J. in the purchase and sale of stocks, but reported to M. & Co. and made his calls upon them for the necessary margins. In their accounts M. & Co. also treated J. as dealing directly with them, and he was charged on their books with the stocks, commissions and interest and credited with the proceeds of sales. *Held*, that M. & Co. were the agents of J., and they could not ignore G.'s agency, and cast the responsibility of a loss upon J., simply because his orders were taken and obeyed in the purchase and sale of the stocks.

2. G. deposited a margin with B., another broker, without demanding security therefor, but, according to the custom of the Board of Brokers, it was optional with G. to do so. He acted in good faith, and when the deposit was made with B., the latter was in full credit. *Held*, that there was no evidence of negligence, such as would make G. responsible for a loss occurring through B.'s insolvency.

3. The law implies a promise from brokers, bankers or other agents, that they will severally exercise competent skill and proper care in the services they undertake to perform, but it neither implies nor requires anything more.

March 24th 1879. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, WOODWARD, TRUNKEY and STERRETT, JJ.

Error to the Court of Common Pleas of *Chester county :* Of July Term 1877, No. 13.

Assumpsit by John R. Johnson against Francis H. Gheen, William H. Morgan and George B. Hickman, trading as Gheen, Morgan & Co., to recover a balance alleged to be due to plaintiff from defendants on certain transactions in stocks. Defendants pleaded non assumpserunt, payment, payment with leave and set-off. At the trial, before Butler, P. J., the following facts appeared. The defendants were bankers and brokers in West Chester, Pennsylvania. Johnson, who did business with the firm, lived at Downingtown, a few miles distant. Desirous of having some dealings in stocks, Johnson applied to the firm for a letter of introduction to their correspondent in Philadelphia, and they gave him the following :

[Gheen, Morgan & Co. v. Johnson.]

"West Chester, Pa., May 16th 1876.

JOHN W. GILBOUGH, Esq., Philadelphia.—Dear Sir:—This will introduce to you Mr. John R. Johnson, of Downingtown. Any orders he may give you please execute on our account; and advise us. Yours truly, GHEEN, MORGAN & CO."

On the 14th day of July 1876, Johnson called on Gilbough at Philadelphia, presented his letter of introduction from the defendants, and gave Gilbough orders to sell for him two hundred shares of Hestonville Passenger Railway stock, at 34⅝, sellers 30. The order was given verbally by Johnson to Gilbough, and Johnson was subsequently informed personally by Gilbough of the sale. On the same day Gilbough advised Gheen, Morgan & Co., of the sale by letter, as follows:

"Philadelphia, July 14th 1876.

Messrs. GHEEN, MORGAN & CO.—Dear Sirs:—I sold for John R. Johnson to-day, two hundred Hestonville R. R. at 34⅝, s. 60. Also advised you by wire. Resp'y yours,

J. W. GILBOUGH."

On the next day, July 15th, Johnson called on Gilbough and gave him directions to sell for him four hundred shares of Hestonville at 35, sellers 60. This order Gilbough executed, informed Johnson personally of the sale, and also advised the defendants by letter, as follows:

"Philadelphia, July 15th 1876.

Messrs. GHEEN, MORGAN & CO.—Dear Sirs:—Your telegram of to-day is received. I sold for John R. Johnson to-day four hundred Hestonville at 35, sellers 60. This makes six hundred shares in all, and we had better have $3000 margin, as the stock is very active, and margins are being called all the time. Omitted to notify you of sale of one hundred Titusville at 10, s. 60, yesterday. Respect. yours, J. W. GILBOUGH."

On July 18th 1876, Johnson called in person on Gilbough, and ordered him to sell one hundred shares of Hestonville at 36, sellers 60, and one hundred shares at 37, sellers 60. Both these sales were made by Gilbough and reported to Johnson in person, the last one hundred shares having been sold for 37⅜, sellers 60. The sales were also reported to Gheen, Morgan & Co. in the following correspondence:

"Philadelphia, July 18th 1876.

Messrs. GHEEN, MORGAN & CO.—Dear Sirs:—Your telegram of to-day is received. I sold, to-day, for J. R. Johnson, one hundred Hestonville at 36, s. 60. Also have an order from Mr. Johnson to sell another one hundred at 37, s. 60. Please to confirm the order. Please keep me margined on all this Heston-

[Gheen, Morgan & Co. *v.* Johnson.]

ville, as the market is excited and advancing, and prompt responses have to be made to keep contracts good.

Respectfully yours,          J. W. GILBOUGH."

"Philadelphia, July 20th 1876.

Messrs. GHEEN, MORGAN & Co.—Dear Sirs:—Your favor of the 19th inst. with stated enclosure is received. Draft on N. Y. for $2350.58. I sold for J. R. Johnson to-day, one hundred Heston-ville at 37⅜, s. 60.          Respectfully yours,

J. W. GILBOUGH."

In response to this call for margin, Gheen, Morgan & Co., on the 19th of July 1876, enclosed to Gilbough a draft on New York for $2350.50, as margin on sales of Hestonville stock made by Gilbough for plaintiff, and on the day following sent $2500 more as margin. On the day of its date they sent the following letter to Johnson:

"West Chester, Pa., July 20th 1876.

JOHN R. JOHNSON.—Dear Sir:—Will you favor us by giving us additional margin on your Hestonville? We were called upon from Philadelphia and had to send $2500 to-day. You will oblige us by giving this your early attention.

Yours truly,          GHEEN, MORGAN & Co."

To this letter Johnson paid no attention until July 26th, when all the sales had been made by Gilbough for him, and Gheen, Morgan & Co., had sent as margin for his contracts made through Gilbough, the sum of $4800. On July 26th, he came over from Downingtown to see Gheen, Morgan & Co., and assigned to them a judgment bond of $4000, as collateral for the $4800 advanced by them on margins, and promised to come over the next day and bring them money or further security. This he never did, and on July 29th, they again wrote him as follows:

"West Chester, Pa., July 29th 1876.

Mr. JOHN R. JOHNSON, Downington, Pa.—Dear Sir:—You will please come over on Monday morning and bring us margin on your stock contracts. Our reports to-day quote Hestonville at 41¾. You will please bring sufficient with you to margin it up to 45 at least.          Yours truly,

GHEEN, MORGAN & Co."

No response was ever made by Johnson to these letters, nor was there any additional margin ever placed with Gheen, Morgan & Co. by Johnson to cover the sums sent to Gilbough. During all these transactions between Johnson and Gilbough, Gheen, Morgan & Co. had no intercourse with Johnson upon the subject. They did not advise Johnson of the sales of Hestonville, that being always done by Gilbough direct. Their whole agency in the

matter was to keep Gilbough secure in margins on such sales as he from time to time made in obedience to Johnson's directions to him, and to this end Gheen, Morgan & Co. sent $4800 of their own funds to Gilbough. Johnson was daily in Philadelphia, gave all orders for sales of Hestonville in person; was in the gallery of the stock board room and Gilbough's office constantly, and followed his own judgment in all these stock transactions.

Of the eight hundred shares of Hestonville stock two hundred were sold on 14th July 1876, to Bond, Moxey & Co., at 34⅝, sellers 30, and on July 15th 1876, two hundred shares at 35, sellers 60, making in all four hundred shares. To secure these sales, Bond, Moxey & Co. called on Gilbough for margin, and to cover these sales for Johnson, Gilbough, on July 22d and 27th 1876, deposited with Messrs. Bond, Moxey & Co. $2475. Johnson was informed by Gilbough of the sales of four hundred shares to Messrs. Bond, Moxey & Co., and of their call for margin, and of the money having been furnished by the defendants. Messrs. Bond, Moxey & Co. were brokers in Philadelphia and members of the Board of Brokers; they represented the parties that were purchasing Hestonville stock and were buying that stock largely. Johnson had talks with Mr. Bond, a member of that firm, and reported what he learned through him to Gilbough. On or about July 29th 1876, Hestonville Railroad stock declined, and when Messrs. Bond, Moxey & Co. were called upon to make good their purchase of four hundred shares of that stock, they were unable to fulfil their contract; the margin on their hands, $2475, was forfeited and charged up against Johnson in the settlement between himself and Gheen, Morgan & Co. It was to recover this sum, $2475, thus deposited as margin, together with the difference between the price at which Bond, Moxey & Co. had purchased the four hundred shares and 27¼, the price at which Johnson purchased stock to cover his sales, that this action was brought.

On the stock transactions in Hestonville, which were made good, Johnson derived a profit of $971.73, and this Gheen, Morgan & Co. paid to him.

The defendants submitted the following points, to which are appended the answers of the court:

1. The letter of introduction, dated May 16th 1876, given by the defendants, introducing the plaintiff to John W. Gilbough, created no liability upon the part of the defendants to the plaintiff for the subsequent conduct of the said John W. Gilbough, in the purchase and sale of stocks, for and on account of the plaintiff, by the said John W. Gilbough.

Ans. "This is true. Of itself the letter did not create such liability. But it is evidence for your consideration, with other facts tending to show the relation of the parties, and thus bears on the question of liability."

[Gheen, Morgan & Co. *v.* Johnson.]

3. There is no liability upon the part of the defendants to the plaintiff in this action for the conduct of John W. Gilbough, in the purchase or sale of stocks made by him for the plaintiff, in pursuance of orders or directions given to him by the plaintiff, without their intervention or previous knowledge.

Ans. "This point is true. That is, if the defendants were not connected with the plaintiff as his agents respecting this business; if Mr. Gilbough was his agent—not theirs, in this transaction—they are not responsible here."

4. If John W. Gilbough, acting in pursuance of orders or directions given him by the plaintiff to sell for him (the plaintiff) 400 shares of the stock of the Hestonville Passenger Railway, on or about the 15th day of July 1876, sold said stock to Bond, Moxey & Co., who were, at the time of said sale, members of the Board of Brokers in good and regular standing, and said sale was in pursuance of the rules governing the said Board of Brokers, then there is no liability on the part of the defendants to the plaintiff in this action, for any loss that may arise from such sale.

Ans. "This is true as respects the loss of sale. But the controversy here is about the loss of money deposited as margin, and presents a different question, of which we will speak more fully in the general charge."

5. If the jury believe that the plaintiff, in pursuance of a letter from the defendants, calling for margin upon sales of stock made for him through John W. Gilbough, and in pursuance of his (the plaintiff's) order, did deposit a sum of money or securities with the defendants, to be applied in that way and for that purpose, then there can be no recovery in this action for the amount of the margin so deposited and applied, and their verdict with respect to the same must be for the defendants.

Ans. "This point is true, unless it appears that the money was lost through negligence of the defendants, or an agent employed by them about the business."

The verdict was for plaintiff for $2551.22. The defendants took this writ, and, inter alia, assigned for error the answers to the foregoing points.

*Charles H. Pennypacker, John J. Pinkerton* and *Wayne Mac-Veagh*, for plaintiffs in error.—In view of the fact that Gheen, Morgan & Co., living at West Chester, gave a letter of introduction and of guaranty for Johnson to Gilbough, and did nothing else except receive advices of the transactions, while Johnson managed his own transactions with Gilbough personally, it is confidently submitted that the relation of principal and agent existed between Johnson and Gilbough to precisely the same extent and with precisely the same consequences as attached to the same relation between Gheen, Morgan & Co. and Gilbough, and that there could

be no responsibility on the part of Gheen, Morgan & Co. to Johnson for any default or negligence on the part of Gilbough.

In these transactions, Johnson unquestionably had two agencies employed, and it is not very important which is considered the principal agency, and which the ancillary or sub-agency.

As matter of fact, it is believed that the testimony proves Gilbough to have been the principal agent of Johnson in these transactions, and Gheen, Morgan & Co. only the ancillary agents; but as Gheen, Morgan & Co. were first employed, in order of time, it cannot make any difference, even if they are regarded as the principal agent, and Gilbough as the ancillary or sub-agent; for the doctrine is as well established as almost any legal doctrine can be established, that the first agent employed is not responsible for any alleged negligence of any ancillary or sub-agent employed by him about the same business, with the knowledge and recognition of the common principal : Story on Agency 247, 274, 407, 474 ; Whart. on Agency, sect. 247. There was not sufficient evidence to justify the submission to the jury of the question whether the deposit of margin by Gilbough with Bond, Moxey & Co., or the failure to exact a counter-margin, when the stock in question was rapidly advancing and the balance of the contract was largely in their favor, was, or was not, an act of negligence. The loss on the margin deposited with Bond, Moxey & Co., was an incident of the sale of the stock to them. There was no evidence in the cause that Gilbough committed any error or neglected any duty. His action was in conformity with the custom in making stock contracts. The defendants were entitled to an affirmance of their fifth point.

*William B. Waddell* and *P. Frazer Smith*, for defendant in error.—Gheen, Morgan & Co. were the agents of Johnson, and Gilbough was acting for them, as he was a member of the Board of Brokers in Philadelphia, and defendants were not. The relation of the parties is shown at the outset by the letter of introduction of May 16th 1876.

Gilbough followed explicitly the directions contained in this letter. He regularly advised Gheen, Morgan & Co. by telegraph and letter, of all that was done. His correspondence was exclusively with them, and they advised Johnson by letter. Gheen, Morgan & Co. opened an account current on their books with Johnson, showing the purchase and sale of stocks, and the profits arising therefrom were carried into their cash-books. These accounts were furnished by Gheen, Morgan & Co. to Johnson. Gilbough at no time furnished Johnson with any accounts, but always accounted to Gheen, Morgan & Co. for all profits on his transactions in Johnson's stocks.

Anong these credits was the item of "margin deposited with Bond,

[Gheen, Morgan & Co. *v.* Johnson.]

Moxey & Co." This deposit was made by defendants. Bond, Moxey & Co. called on Gheen, Morgan & Co. through Gilbough for margins, and they were put up. Gheen, Morgan & Co. failed to require a margin from Bond, Moxey & Co., although, by the rules of the board, either party could call for margins at any time. Had Gheen, Morgan & Co. required margins from Bond, Moxey & Co. this loss would not have occurred. Gilbough discovered his error, and saw the force of this mistake when the market broke, for he then called upon Bond, Moxey & Co. for margins.

The object of margins being to secure the dealers from loss, it was the duty of Gheen, Morgan & Co. to protect their principal by requiring from Bond, Moxey & Co. a deposit or margin. They were bound to consider the contingency of a failure on the part of Bond, Moxey & Co. They knew the extent of their purchases, and therefore their greater liability. The measure of duty in this case was ordinary and reasonable care, and therefore what was negligence was a question for the jury: Philadelphia City Passenger Railway Co. *v.* Hassard, 25 P. F. Smith 367. So where the standard of duty is a shifting one: Glassey *v.* Hestonville Passenger Railway Co., 7 P. F. Smith 172. Where a higher degree of care is demanded under some circumstances than under others—where both the duty and the extent of its performance are to be ascertained as facts, the jury alone can determine what is negligence, and whether it has been proven: Chrissey *v.* Hestonville Railway Co., 25 P. F. Smith 83. Such being the law, the learned judge very properly left all the facts to the jury to determine the question of negligence.

Mr. Justice GORDON delivered the opinion of the court, May 7th 1879.

Were there any point raising the question of the legality of the transactions between the parties now before us, we must needs give this case but short shrift; for the evidence clearly reveals the fact, that the money claimed in this suit is the product of certain successful adventures in stock gambling. According to the statements exhibited by the defendants, the value of the stocks alleged to have been bought and sold for and on account of the plaintiff, amounted to some $20,000. For these stocks he paid not one dollar in money, and the only consideration of value which passed between the parties was the assignment of a four thousand dollar bond, which was executed by Johnson to the defendants, as collateral security, not for the stocks, but for certain margins by them advanced for him, and which bond afterwards, on settlement, was reassigned to him. Payment for these stocks was not required; the sale of them was a mere pretence; not a single share was either tendered or demanded; Johnson's dealings were solely on margins, and for this purpose alone was the credit of the defendants loaned to him.

[Gheen, Morgan & Co. v. Johnson.]

No authority is needed to show that courts of justice will not lend their aid to enforce a contract such as that above stated. Nevertheless, since the parties themselves have refused to raise the question of the legality of this transaction, I cannot see how we can convict the learned judge of the court below of error for not doing that which he had no opportunity of doing. Had the defendants chosen to confess judgment, I suppose the court could not have refused to enter it; and so, if the defendants refused to avail themselves of a defence which they might have had, the court cannot be blamed for not forcing it upon them.

We are thus forced to take the case as we find it, and to treat the transactions of these parties as lawful and valid. Our first inquiry, then, is, whether the instructions of the court as to Gilbough's agency, were or were not correct? For whom was Gilbough operating? Who was his principal, and to whom did he account? The letter of introduction of May 16th, which Johnson bore from the defendants to Gilbough, of itself answers these questions. "This will introduce you to Mr. John R. Johnson, of Downingtown. Any orders he may give you, please execute on our account, and advise us." His orders were to be executed for them; on their, not his, account, and they were to be kept advised. The reason for these instructions is obvious: Johnson was their customer; they were brokers in West Chester, and in order to conduct the business in which Johnson intended to engage, it was necessary that they should have a correspondent who was a member of the Board of Brokers in Philadelphia. Hence it was, as we find by the subsequent dealings of the parties, that Gilbough obeyed the instructions of Gheen, Morgan & Co. to the letter. He fulfilled Johnson's orders in the purchase and sale of stocks, but he reported to Gheen, Morgan & Co., and made his calls upon them for the necessary margins, and they, in turn, reported to Johnson and made their calls upon him. Gilbough never recognised Johnson as his principal, and if he in anything obeyed the orders of Johnson, it was only by reason of the previous instructions of Gheen, Morgan & Co., and thus Johnson's orders were, in effect, the orders of that firm.

But again, the defendants, in their accounts, treat the plaintiff as dealing directly with themselves. He is charged with the stocks, commissions and interest, and he is credited with the proceeds of the sales. In these accounts the name of Gilbough nowhere appears, and whatever he may have received for his services, he received from the defendants, and not from the plaintiff. After thus assuming the responsibility of this whole business, they cannot ignore Gilbough's agency and cast the responsibility of it upon Johnson, simply because, in pursuance of their instructions, Johnson's orders were obeyed in the sales of stocks. These orders may have some force, as bearing upon the question of Gilbough's negli-

[Gheen, Morgan & Co. *v.* Johnson.]

gence, but not otherwise; and even as to this, they amount to no more than if given directly to the defendants. On this branch of the case we have no fault to find with the rulings of the court.

The final, and only remaining question for consideration is the answer to the defendant's fifth point. The court was asked to charge, that if, in pursuance of a call for margins on stock sold for and on the order of the plaintiff, he deposited money or securities to be applied in that way, there could be no recovery for the amount of the margin so deposited and applied. The answer was, "this point is true, unless it appears that the money was lost through the negligence of the defendants, or an agent employed by them about the business."

This answer assumes that there was evidence sufficient to charge the defendants with negligence in the conduct of the plaintiff's business. We are obliged to say that we have not been able to discover any such evidence. According to the evidence of Gilbough and the statement of the defendant in error, four hundred shares of Hestonville had been sold short, on Johnson's account, to Bond, Moxey & Co., to be delivered within sixty days, seller's option, at $35 per share. As this stock soon after commenced to rise in the market, Bond, Moxey & Co. made a call upon Gilbough for margin, and he, thereupon, deposited with them some $2500. For the amount of this margin, lost through the failure of the firm above named, this suit is brought. There was nothing irregular in the transaction itself; it was quite proper, under the circumstances, for the one party to call a margin and for the other to furnish it. It was only by thus meeting the call for margin that the contract upon part of Johnson could be maintained, for, as he had no stock, he could not meet the emergency by a tender. Had, then, Bond, Moxey & Co. remained solvent the transaction would have been unexceptionable, though the margin had all been consumed by the rise in the price of the Hestonville stock. Thus, the matter resolves itself into the question, whether the defendants were responsible for the insolvency of Bond, Moxey & Co.; ought they to have provided for a contingency such as this? In this transaction it was their duty to exercise reasonable care, such as a prudent man would exercise in and about his own business. Did they or their agent exercise such care? There does not appear to be any evidence to the contrary. For all that appears, these parties were perfectly good when the contract was made and the money, for the margin, deposited with them. As matters then stood, it does not appear that there was the slightest degree of imprudence in trusting them with this amount of money, and the more so as the balance on the contract was then in their favor. It is true, according to the testimony of Mr. Maris, Gilbough might have called for a counter-deposit; he says, however, that when the contract has been running for some time, and there is a balance in favor of one

[Gheen, Morgan & Co. v. Johnson.]

party or the other, the party in whose favor the balance is, will frequently call for a margin without making a deposit himself. He further says, that if stock is sold on seller's option, and the stock advances, the purchaser will, in that event, call a margin in order to insure a delivery of the stock at the end of the time. It would thus seem, that these deposits are intended to insure an execution of the contract, and not to provide against the contingency of insolvency, and that, ordinarily, these calls are made by the party in whose favor is the balance. Following this general custom, Bond, Moxey & Co. called a margin, and it was regularly met by Gilbough's deposit. To say, under such circumstances, that he should have required security, for the return of the deposits, from a firm in full credit, would be to say that he must have exercised a degree of care which would be equivalent to an insurance against possible loss. This, however, is asking too much of an agent. The law implies a promise from brokers, bankers, or other agents, that they will severally exercise competent skill and proper care in the service they undertake to perform, but it neither implies nor requires more than this: Wingate v. The Mechanics' Bank, 10 Barr 108.

The judgment is reversed.